United States District Court
Southern District of Texas
**ENTERED**
January 15, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| M.V. b/n/f/ J.C., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-18-401 |
| | § | |
| | § | |
| CONROE INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

M.V. and his father, J.C., appealed the decision of a Texas Special Education Hearing Officer denying M.V.'s claims against the Conroe Independent School District under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* In this court, M.V. asserted three additional claims: one under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132; one under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and one under 42 U.S.C. § 1983. After this court denied M.V.'s motion to admit additional evidence supporting his claims under the ADA, the Rehabilitation Act, and § 1983, M.V. voluntarily withdrew these claims. (Docket Entry No. 25).

The School District has moved for summary judgment on M.V.'s IDEA appeal. M.V. responded. (Docket Entries No. 27, 29). Based on the motion, response, and reply; the administrative record; and the applicable law, the court grants the School District's motion for summary judgment and, by separate order, enters final judgment. The reasons are detailed below.

## I. Background

M.V. was a student in need of special-education services based on his diagnosis of Attention Deficit Hyperactivity Disorder. In 2010 and 2011, M.V. had several Full and Individual Evaluations showing that he was emotionally disturbed, had a low average intellectual ability score, and had emotional issues that affected his academic performance.

In September 2012, M.V. enrolled in the Conroe Independent School District as a fifth grader. M.V.'s Functional Behavior Assessment in 2012 showed that he had difficulty sustaining the effort necessary for independent work, and that he lied to teachers. The Assessment included a Behavior Intervention Plan. In March 2013 and May 2014, M.V. received two additional Assessments, addressing his physical aggression and absences from class. Based on these Assessments, the School District found that M.V.'s behaviors no longer required intervention. M.V.'s disability classification changed in May 2014, when the School District found that although M.V. was still qualified for special education services, he did not meet the disability condition for a student with Emotional Disturbance.

In April 2017, while M.V. was in ninth grade, a rumor circulated at school that he had a "hit list" and intended to attack other students. (Docket Entry No. 17-5 at 185). M.V. took a photo in which he used his hand to mimic a handgun, and a student posted this photo on Snapchat with the caption stating "Don't come to school tomorrow." (*Id.*). On April 28, 2017, the School District held a Manifestation Determination Review (MDR) meeting to discuss this incident. M.V. and J.C. attended the meeting with the Admission, Review, and Dismissal Committee members. After the MDR meeting, the School District found M.V.'s misbehavior impulsive and unrelated to his

disability. (Docket Entry No. 175). J.C. requested a due-process hearing, but the parties settled their dispute in mediation before the hearing. (Docket Entry No. 1 at 9).

On September 26, 2017, M.V. came to school with two stun guns and a bottle of his brother's Adderall, a controlled substance for which M.V. did not have a prescription. (Docket Entry No. 28-1 at 11). M.V. admitted that he bought the stun guns online and brought them to school to sell. M.V. also admitted that he brought his brother's Adderall to school to improve his performance on a test scheduled for that day. (Docket Entry No. 17-3 at 56).

In October 2017, the School District held a MDR meeting to discuss M.V.'s possession of the stun guns and Adderall. (Docket Entry No. 17-1). The School District found that M.V.'s misbehavior was not caused by, or directly and substantially related to, his disability. At the meeting, the ARD Committee discussed how M.V.'s disability manifested itself. After considering M.V.'s medical evaluations, discipline and academic records, and teachers' comments, the ARD Committee found that impulsivity was the primary symptom of M.V.'s Attention Deficit Hyperactivity Disorder. According to the ARD Committee, M.V.'s actions of researching stun guns, ordering them online, and bringing them to school to sell were not impulsive behaviors, but premeditated conduct unrelated to his disability. The School District decided to expel M.V. under Texas Education Code § 37.006(a)(2)(C) and § 37.007(a)(3). The expulsion was deferred for 135 school days. If M.V. had no major behavior issues during that period, the School District would void his expulsion.

At the beginning of the MDR meeting, Stephanie Hardwick, an educational diagnostician, projected a draft version of the MDR meeting documents. The draft stated that "[b]ased on this information, the committee has determined that these behaviors were not due to impulsivity."

3

(Docket Entry No. 17-5 at 123). J.C. pointed to the draft as showing that the MDR meeting outcome was predetermined, without his or M.V.'s participation. (Docket Entry No. 1 at 9–10). Hardwick explained to J.C. that the projected documents were just a draft subject to change. During the MDR meeting, J.C. was asked if he wanted to discuss the manifestations of M.V.'s disability or issues of his Individualized Plan implementation, but he declined to do so. (Docket Entry No. 28-1, at 14:10–15:12; 15:22–16:3; 17:4).

At J.C.'s request, a due-process hearing was held to review the expulsion. (Docket Entry No. 17-5 at 3). At the hearing, J.C. raised two issues: (1) whether the School District improperly predetermined the MDR meeting result; and (2) whether the District was incorrect in deciding that M.V.'s disability did not cause, or have a direct or substantial relationship to, his misconduct.

Hardwick attended the due-process hearing and testified on the predetermination question. According to Hardwick, she drafted the MDR documents in advance, knowing that they were subject to change based on the meeting result. (Docket Entry No. 17-5 at 123). Hardwick explained that the projected documents were only a draft, as indicated in the header, intended to facilitate the ARD Committee members' preparation for, and discussion in, the MDR meeting.

Dr. Stephanie Jensen, a licensed specialist in school psychology, testified to the ARD Committee's decisionmaking. (Docket Entry No. 17-5 at 206–241). She conducted evaluations for students with special-education needs, attended ARD Committee and MDR meetings, and consulted with teachers. Dr. Jensen testified that before M.V.'s October 2017 MDR meeting, she received a copy of his Full and Individual Education reports, met with his teachers and the assistant principal, and discussed his behaviors with the ARD Committee members. (*Id.* at 208–09). Dr. Jensen explained that to decide whether M.V.'s misbehavior was linked to his disability, the ARD

4

Committee considered all the information related to M.V. According to Dr. Jensen, impulsivity was the major concern of M.V.'s disability because his past disciplines for such acts as making inappropriate comments in class, wrapping a jump rope around other student's neck, and fighting with other students, showed his "in-the-moment-type, impulsivity-type thinking." (*Id*. at 212). Dr. Jensen testified that M.V.'s acts of bringing the Adderall and stun guns to school were planned decisions rather than impulsive acts caused by his disability. (*Id*. at 223). She believed that M.V. knew the difference between right and wrong, because he had been disciplined for prior misbehavior and because he had written a letter apologizing to his father after he was caught hiding the Adderall in his backpack. Teronica Walls, a School Psychology Specialist Trainee, reviewed M.V.'s individualized report, attended the October 2017 MDR meeting, and testified to the same at the due-process hearing. (Docket Entry No. 17-6 at 21–28).

Dr. Graciela Reyes-McDonald testified for M.V. at the due-process hearing. (Docket Entry No. 17-5 at 156). She reviewed M.V.'s Full and Individual Evaluation reports, but she did not examine him. Disagreeing with Dr. Jensen and Walls, Dr. Reyes-McDonald opined that M.V.'s misbehavior was directly related to his disability. (Docket Entry No. 17-5). Dr. Reyes-McDonald testified that M.V.'s evaluations and reports showed that he had executive-functioning deficits and difficulty inhibiting his behavior, because he did not understand the consequences of his actions and he could not plan, organize, or set goals. (*Id*. at 169, 172). Dr. Reyes-McDonald opined that executive-functioning deficits and inhibition difficulties were manifestations of M.V.'s Attention Deficit Hyperactivity Disorder. (*Id*. at 173). In her view, M.V. brought Adderall to school because he wanted to do better on the October 2017 test, but he could not properly plan to achieve that goal or stop himself before his behavior resulted in bad consequences, even though he knew it would

cause him "big trouble." (*Id*. at 175–76). Dr. Reyes-McDonald concluded that M.V.'s misbehavior was directly and substantially related to his disability. (*Id*. at 178).

J.C. and M.V. also contend that the October 2017 MDR decision was wrong because it conflicted with the School District's decision in April 2017. In the earlier MDR meeting, the School District focused on M.V.'s executive-functioning deficits and found that his action of mimicking the pointing of a handgun was an impulsive act unrelated to his disability. According to J.C., the School District could not focus on the nonimpulsive character of M.V.'s disability in April but change its course to rely on its impulsive aspects in October.

The hearing officer denied M.V.'s appeal and found that the School District did not predetermine the MDR decision or err in concluding that M.V.'s acts of bringing the stun guns and Adderall to school were not manifestations of his disability. (Docket Entry No. 17-1 at 5–6). M.V. and J.C. appealed to this court. (Docket Entry No. 1). The School District moved for summary judgment, and M.V. responded. (Docket Entries No. 27, 29). This court has jurisdiction under 20 U.S.C. § 1415(i)(2)(A).

## II. The Legal Standard

### A. The Summary Judgment Standard for Reviewing an IDEA Appeal

A district court reviews the decision of a due-process hearing officer "virtually *de novo*." *Dall. Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017) (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997)). The court "receives the records of the administrative proceedings and also takes additional evidence at the request of any party." *Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 582–83 (5th Cir. 2009). "As a practical matter, the IDEA creates a presumption in favor of the education plan proposed by the school

district, and places the burden of proof on the party challenging it." *Renee J. Hous. Indep. Sch. Dist.*, 333 F. Supp. 3d 674, 683 (S.D. Tex. 2017) (quotation omitted); *see also White ex rel. White v. Ascension Par. Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). In reaching this decision, "courts must be careful to avoid imposing their view of preferable educational methods upon the State." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982).

A district court adopts a different standard for reviewing a summary judgment motion in IDEA appeals. *E.R. by E.R. v. Spring Branch Indep. Sch. Dist.*, 909 F.3d 754, 762 (5th Cir. 2018); *Seth B. ex rel. Donald B. v. Orleans Par. Sch. Bd.*, 810 F.3d 961, 966–6 (5th Cir. 2016). In *E.R.*, the Fifth Circuit summarized the summary judgment standard for an IDEA appeal:

> Under 20 U.S.C. § 1415(i)(2)(C) . . . a district court must (i) "receive the records of the administrative proceedings"; (ii) "hear additional evidence at the request of a party"; and (iii) base "its decision on the preponderance of the evidence" and "grant such relief as the court determines is appropriate." The district court is required to "accord 'due weight' to the hearing officer's findings," but it "must ultimately reach an independent decision based on the preponderance of the evidence." Thus "the district court's 'review' of a hearing officer's decision is 'virtually de novo.'" Accordingly, in IDEA proceedings, summary judgment "is not directed to discerning whether there are disputed issues of facts, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed."

*E.R.*, 909 F.3d at 762 (citing *Seth B.*, 810 F.3d at 966–67); *see also Fenee J. v. Hous. Indep. Sch. Dist.*, 333 F. Supp. 3d 674, 683 (S.D. Tex. 2017). The standard of review is "more expansive than the usual *de novo* review for summary judgments, as prescribed by Federal Rule of Civil Procedure 56(a)." *E.R.*, 909 F.3d at 762.

**B.     The IDEA**

"One of the primary purposes of the IDEA is to ensure that children with disabilities receive a 'free appropriate public education that emphasizes special education and related services designed

7

to meet their unique needs and prepare them for further education, employment, and independent living.'" *V.P. ex rel. Juan P.*, 582 F.3d at 581; 20 U.S.C. § 1400(d)(1)(A). A school district must "(1) provide each disabled child within its jurisdiction boundaries with a 'free appropriate public education' tailored to his unique needs, and (2) assure that such education is offered . . . in the least restrictive environment consistent with the disabled student's need." *Michael F.*, 118 F.3d at 247. A district court must first determine whether the State has complied with the IDEA procedures. *Rowley*, 458 U.S. at 206; *see also V.P. ex re. Juan P.*, 582 F.3d at 583. Second, the court must determine if the Individual Education Programs developed through the IDEA is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07. If both requirements are satisfied, "the obligations imposed by Congress and the courts can require no more." *Id*.

M.V.'s appeal challenges his expulsion. 34 C.F.R. § 300.530(c). Before a school district may change a disabled child's educational placement for disciplinary reasons, the IDEA requires a MDR meeting. 34 C.F.R. § 300.530(c). The MDR meeting is between the child's parents and relevant members of the student's ARD Committee, convened to determine whether the student's misconduct was a manifestation of a disability. 34 C.F.R. § 300.530(e)(1). The MDR meeting determines whether: (1) the student's conduct was caused by, or had a direct and substantial relationship to, the student's disability; or (2) the conduct was the direct result of the school district's failure to implement the student's individualized education plan. *Id*. MDR meetings are intended to "analyze the child's behavior as demonstrated across settings and across time when determining whether the conduct in question is a direct result of the disability." H.R. 779, 108th Cong. at 224–25 (2004); *see also N. E. Indep. Sch. Dist. v. N.B.*, No. SA-10-CA-37-H, 2011 WL 13272730, at *2

(W.D. Tex. Feb. 25, 2011). At or before MDR meetings, IDEA procedures guarantee parents the right to examine school records, to participate in the development of individualized education plans for their children, and to attend an impartial due-process hearing to air complaints about the school district's "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6), 1415(f); *L.F. v. Hous. Indep. Sch. Dist.*, No. H-08-2416, 2009 WL 3073926, at *14 (S.D. Tex. Sept. 21, 2009).

## III. Analysis

### A. Predetermination

Under the IDEA, parents have the right to participate fully in meetings relating to their child's Individualized Education Plan and evaluation. 20 U.S.C. § 1415(b). M.V. argues that the School District's MDR meeting decision is invalid because the School District decided the result before the hearing. M.V. points to the draft decision document projected at the beginning of the meeting, which stated that "[b]ased on this information, the committee has determined that these behaviors were not due to impulsivity." (Docket Entry No. 17-5 at 123).

"Predetermination occurs when the state makes educational decisions too early in the planning process, in a way that deprives the parents of a meaningful opportunity to fully participate as equal members of the [Individualized Education Plan] team." *E.R.*, 909 F.3d at 769 (citing *R.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1188 (11th Cir. 2014)). A child's placement on disciplinary status is not predetermined if the state "has an open mind and might possibly be swayed by the parents' opinions and support for the [Individualized Education Plan] provisions they believe are necessary for their child." *Id*. "[P]redetermination is not synonymous with preparation," which the IDEA allows. *Id.* (quoting *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610–11

9

(6th Cir. 2006)); *see also Fitzgerald v. Fairfax Cty. Sch. Bd.*, 556 F. Supp. 2d 543 (E.D. Va. 2008) (the ARD Committee did not violate the IDEA by discussing and predicting the result before the MDR meeting with the child and his parents, because the record showed that the Committee "did not approach the hearing with closed minds, but rather carefully considered all information at the hearing before making [the] determination"). The right to participate is "not the right to dictate an outcome and obviously cannot be measured by such." *White*, 343 F.3d at 380.

Although the School District had prepared a draft decision document before the MDR meeting, Hardwick testified that the draft was subject to change and was used only to facilitate the ARD Committee members' preparation for, and discussion in, the MDR meeting. (Docket Entry No. 17-5 at 123). Hardwick explained that if the ARD Committee concluded that M.V.'s conduct was a manifestation of his disability, she would change the draft documents. (*Id*. at 11). At the due-process hearing, witnesses testified that the ARD Committee members came to the MDR meeting "with an open mind," "ready to hear all relevant information." (*Id*. at 55).

Both M.V. and J.C. had the opportunity to participate in the MDR meeting and to talk about M.V.'s behavior and its connection to his disability. (Docket Entry No. 28-1). At the meeting, the Committee reviewed M.V.'s behavior, disability evaluations, academic performance, and education goals. (*Id*.). The Committee asked J.C. for comments and opinions, but he declined to provide additional information. (*Id.* at 14:10–15:12; 15:22–16:3; 17:4).

M.V. offers no reason to believe that the School District "would not have listened to, and considered" J.C.'s position at the MDR meeting. *See E.R.*, 909 F.3d at 769. The record evidence shows that the ARD Committee considered the relevant information before it decided to adopt the draft. Without more, M.V. fails to show that the School District violated the IDEA by preparing a

draft decision before the MDR meeting.

**B.      The School District Did Not Err in Finding that M.V.'s Misbehavior Was Not a Manifestation of His Disability**

The School District found that M.V.'s misconduct was premeditated, not impulsive, and not a manifestation of his Attention Deficit Hyperactivity Disorder. M.V. and J.C. argue that the School District's decision was wrong, because Dr. Reyes-McDonald testified that M.V.'s disability precluded him from thinking through the consequences of his actions or making good plans to achieve his goals, and because that decision was contrary to the School District's April 2017 finding that M.V.'s impulsive misconduct of making a gesture of mimicking firing a gun was unrelated to his disability.

Conduct is a manifestation of a student's disability if it "was caused by, or had a direct and substantial relationship to, the child's disability" or if it "was the direct result of the [local educational agency]'s failure to implement the [Individualized Education Plan]." 34 C.F.R. § 300.530(e). The parties do not dispute that M.V.'s acts of bringing the stun guns and Adderall to school were premeditated, not impulsive.[1] The question is whether the School District erred in focusing on the impulsivity aspect of M.V.'s disability, without separately discussing his executive-functioning deficits.

M.V.'s medical records and discipline history support the School District's finding that

---

[1] M.V. admitted that he researched stun guns, bought them online, and brought them to school to sell for cash, because J.C. did not allow him to work. M.V. also admitted in his apology letter that he brought the Adderall to school because it was better than his own medicine and helped him to focus during exams. (Docket Entry No. 17-5 at 91–92). At the MDR meeting, J.C. agreed that these activities are not impulsive. (Docket Entry No. 28-1 at 13).

11

impulsivity was the key characteristic of his Attention Deficit Hyperactivity Disorder. Teronica Walls testified that she reviewed M.V.'s medical records, in which his Licensed Professional Counselor reported that "the main focus of her sessions with M.V. [wa]s behavioral, including currently working on M.V.'s ability to control impulse behaviors." (Docket Entry No. 17-6 at 25). Dr. Jensen testified that M.V.'s teachers reported his impulsive misconduct at school, including making inappropriate comments and blurting in class, putting a jump rope around another student's neck, and fighting with others. (Docket Entry No. 17-5 at 212–13, 216). J.C. had agreed that impulsivity was a major concern when M.V. was at home. (*Id.* at 216). Considering M.V.'s Individual Evaluations, discipline records, school records, and his teachers' comments, the School District properly concluded that the major symptom of M.V.'s disability was impulsivity, which was unrelated to his premeditated actions of bringing the stun guns and prescription Adderall to school. (*Id.* 218).

Dr. Reyes-McDonald testified that M.V.'s misconduct was related to his executive-functioning deficits and was therefore a manifestation of his Attention Deficit Hyperactivity Disorder. Her conclusion was based on M.V.'s Behavior Rating Inventory of Executive Functioning, a report measuring the extent to which M.V. had problems in the eight domains of executive functioning. (Docket Entry No. 17-4 at 119). That report showed M.V.'s difficulties monitoring his own actions, resisting impulses, and stopping his impulses to behave inappropriately. (Docket Entry No. 17-4 at 119). Although Dr. Jensen agreed that M.V.'s medical records could show a disability causing executive-functioning deficits, she testified that considering all the relevant information, M.V.'s acts of acquiring and bringing the stun guns to school to sell and bringing his brother's Adderall to help him in his test did not involve impulsivity problems most

12

strongly linked to his disability. (Docket Entry No. 17-5 at 212).

Dr. Reyes-McDonald testified that the Behavior Rating Inventory of Executive Functioning results indicated that M.V. had trouble with planning, organizing, or appreciating the consequences of his conduct. According to Dr. Jensen, it is common for adolescents to make poor choices. M.V.'s poor choices to bring stun guns and prescription Adderall to school did not show that he failed to think through the consequences of his conduct. (Docket Entry No. 17-5 at 222–24). To the contrary, M.V.'s apology letter stated that he brought the Adderall to school because he had used the drug before and knew that it could help him do better on tests. (Docket Entry No. 17-3 at 16). That statement, and the planning to acquire the stun guns, showed that M.V. understood the objects and goals of his behavior and planned to achieve them. The record also shows that M.V. understood the nature and consequences of his actions, because when he was caught by the assistant principal, he already knew that he was "in really big trouble." (*Id*. at 224). The evidence that his plans, while showing poor judgment, were not caused by, or related to, M.V.'s disability, supports the School District's MDR meeting decision.

Dr. Jensen testified that the ARD Committee did not spend much time reviewing M.V.'s impulsivity or his discipline history because J.C. was not interested in discussing them at the MDR meeting. (*Id*. at 233). At the meeting, the District representatives asked J.C.'s opinion on the manifestation link. J.C. did not ask any questions or provide additional information on the implementation of M.V.'s Individual Education Plan. The MDR meeting transcript reads as follows:

Dr. Jensen: All right. Do you have any questions regarding [impulsivity] or anything?

J.C.: No.

Dr. Jensen: You would like us to talk about with that?

> J.C.: Huh-uh.
>
> Dr. Jensen: Okay.
>
> Hardwick: And so the next part—the next question that we have to answer is the conduct in question was the direct result of the local education agency's failure to implement the [Individualized Education Plan]. So we have to discuss that, was there any failure on our part to implement [M.V.'s Plan].
>
> Rivera: Talk a little about what that is, what kind of services did the ARD Committee say that he needed and . . . .
>
> J.C.: We can—I'm fine with passing on that question.
>
> Rivera: You're okay?
>
> J.C.: Yeah.

(Docket Entry No. 28-15 at 14–15). The School District did not err in finding that impulsivity was the key characteristic of M.V.'s disability and that it was unrelated to the misbehavior at issue or to the plan implementation.

At the due-process hearing, J.C. pointed to the School District's April 2017 MDR decision, which found that M.V.'s gun-gesturing photo was an impulsive activity, but still unrelated to his disability. J.C. argues that the School District could not have properly found, within the same year, that neither impulsive nor impulsive behavior was related to M.V.'s disability. After the April 2017 MDR decision, J.C. requested a due-process hearing but settled with the School District before the hearing. As this court has found, M.V. and J.C. did not exhaust the administrative procedures for reviewing the School District's April 2017 decision. This court does not have jurisdiction to review M.V.'s unexhausted claim. 20 U.S.C. § 1415(l); *Marc V. v. N. E. Indep. Sch. Dist.*, 455 F. Supp. 2d 577, 591–92 (5th Cir. 2006). And the School District's manifestation decisions addressed different behaviors. The two decisions must be reviewed separately to evaluate whether the record supports

14

each. For the reasons discussed earlier, M.V.'s Individual Evaluations, discipline history, school records, and teachers' reports are sufficient to support the School District's October manifestation decision that impulsivity was the primary concern of M.V.'s disability and that his act of bringing stun guns and Adderall to school was not caused by, or directly and substantially related to, the disability.

## C. M.V.'s Procedural Challenges to the State Due-Process Hearing

M.V. and J.C. argue that the due-process hearing violated the IDEA because: (1) it failed to rule on whether the School District considered all relevant information before making the manifestation determination; (2) the state hearing officer's decision was only 5 pages, although this type of decision is usually more than 20 pages; (3) the hearing officer improperly limited the hearing time to 4 hours for each side; (4) the hearing officer improperly denied M.V.'s request for a continuance to allow one of his expert witnesses to attend the hearing; (5) the hearing office did not help J.C., a *pro se* litigant, make his argument that the School District failed to implement M.V.'s Individualized Education Plan; and (6) the hearing officer gave improper weight to the evidence J.C. and M.V. presented. (Docket Entry No. 1 at ¶¶ 38–48). The School District moves for summary judgment on these claims, contending that the hearing officer conducted the hearing and issued the opinion in compliance with the IDEA. (Docket Entry No. 27 at 25–27). This court agrees.

In its September 2018 Memorandum and Opinion, this court found that although the state hearing officer limited the hearing to 4 hours for each side, she allowed the parties to ask for more time if they needed it. (Docket Entry No. 17 at 373). At the hearing, J.C. rested without using all his time, objecting to the time limit, or asking for additional time. (*Id*. at 641). The hearing officer did not deprive M.V. or J.C. of an opportunity to present evidence by declining to extend the

15

hearing, because M.V. did not mention his additional expert at the hearing or object to the inability to call that witness. Summary judgment is granted for the School District as to claims (3) and (4).

As to claim (1), as discussed above, the record shows that the School District considered the relevant information and found that M.V.'s misconduct was not caused by, or directly or substantially related to, his disability. The record supports that finding. To the extent that M.V.'s Individual Evaluations, discipline history, and plan implementation were not discussed in detail at the MDR meeting, the record shows that J.C. declined to discuss them, not the School District.

The hearing officer's concise opinion provides a sufficient basis to support the conclusion that the School District's MDR meeting complied with the IDEA, that the School District reviewed the relevant information, and that the School District correctly found that M.V.'s misconduct was unrelated to his Attention Deficit Hyperactivity Disorder. (Docket Entry No. 17-1 at 66–70). The hearing officer made the following factual findings:

> Prior to the ARD meeting and MDR on October 3, 2017, an educational diagnostician prepared a draft version of ARD documents for consideration of the committee. Some of the drafted documents were projected on a screen for the discussion of the committee. The student's parent complained that the drafted documents showed that the decision for MDR was predetermined. The educational diagnostician stated that the drafts had been made to facilitate discussion and that no determination had been made prior to the meeting.
>
> The committee discussed the student's disability and how it manifests itself for the student. A licensed specialist in school psychology for the district stated that the student's impulsivity is the primary concern for interference in the student's educational effort. The committee believed that the student's actions of bringing stun guns and Adderall to school demonstrated a well thought-out plan, not an impulsive act.
>
> The student's parent was in attendance at the meeting but provided little input, declined requests to share information, and did not indicate disagreement with the committee's determination until the ARD documents were presented for signature.

16

> The student's parent believes the committee gave insufficient weight to issues with inattention and avers that the student sought self-medication to address the disability. The student's parent presented an expert witness in support of the idea the student's problems with executive functioning inhibited the student's ability to prevent the conduct at issue.
>
> The district's personnel—including staff directly evaluating the student and working with the student—offered credible testimony demonstrating that the conduct in question could not reasonably be considered impulsive and that the student's issues with executive functioning were not manifesting in the student's conduct.

(Docket Entry No. 17-1 at 68–69). A hearing officer is not required to explain in detail how much credit she gave each individual witness's testimony. "Comparing the length of the hearing officer's decision to . . . other decisions shows little about its accuracy or reliability," and such a comparison does not "reveal much about the hearing officer's competence to hear evidence, apply the law, and issue correct, reliable, fair decisions." *Renee J.*, 333 F. Supp. 3d at 698–99. Although a federal court reviews a state hearing officer's decision *de novo*, the findings of the hearing officer who heard live testimony and observed witness demeanor deserve consideration, because the officer is in the best position to determine credibility. *Id.* (citing *D.B. Hous. Indep. Sch. Dist.*, No. H-06-354, 2007 WL 2947433, at *11 (S.D. Tex. Sept. 29, 2007)). The record and law support the hearing officer's findings, entitling the School District to summary judgment on M.V.'s claims (1), (2), and (6).

M.V. contends that the hearing officer did not help him, a *pro se* litigant, challenge the School District's implementation of M.V.'s Individualized Education Plan, an argument that "certainly would have" been raised by a special-education attorney. (Docket Entry No. 1 at 16). But J.C. failed to raise the issue when asked to do so at the MDR meeting. The IDEA does not require a state hearing officer to do more. M.V. also fails to provide a legal basis for his argument that raising this claim at the due-process hearing would have affected the outcome. Summary

judgment is granted on M.V.'s claim (5).

## IV. Conclusion

The record, reviewed *de novo*, shows that the School District and the state hearing officer complied with the IDEA and properly addressed M.V.'s educational needs. The School District did not predetermine the manifestation decision; gave proper consideration to the information relevant to M.V.'s disability, including his Individual Evaluations, discipline history, school records, teachers' comments, and misconduct; and did not err in finding that M.V.'s misconduct was not caused by, or directly and substantially related to, his Attention Deficit Hyperactivity Disorder.

Summary judgment for the School District is granted. Final judgment is separately entered.

SIGNED on January 15, 2019, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge